**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | CRIMINAL NO. H-04-108 |
| GUADALUPE MENDOZA | § | |
| | § | |
| | § | |
| | § | |

**ORDER ADOPTING IN PART AND REJECTING IN PART MEMORANDUM
AND RECOMMENDATION OF MAGISTRATE JUDGE ON MOTION TO
SUPPRESS EVIDENCE**

This court has reviewed the Memorandum and Recommendation of the United States

Magistrate Judge signed on December 9, 2004, granting the motion to suppress filed by

defendant Guadalupe Mendoza.  (Docket Entry No. 51).  This court has also considered the

objections filed by the government and made a *de novo* determination.  FED. R. CIV. P. 72(b);

28 U.S.C. § 636(b)(1)(C); *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989).

This court finds that the Memorandum and Recommendation should be, and the same is

hereby, adopted in part and rejected in part.  Accordingly, it is ordered that the motion to

suppress on the basis that the initial stop violated the Fourth Amendment is denied, adopting

the Magistrate Judge's recommendation; the motion to suppress on the basis that the consents

to search were not voluntary is denied, rejecting the Magistrate Judge's recommendation.

The reasons for these rulings is set out below.

## I.   Background

The Magistrate Judge held an evidentiary hearing, which is transcribed.  The evidence includes videotapes of the investigatory stop.  Six law enforcement agents testified, two police officers, one sheriff's deputy, and three special agents from ICE.  The testimony was largely undisputed.  The defendants did not testify.  The government has not objected to the facts stated in the Magistrate Judge's Memorandum and Recommendation, but has argued that the facts do not support the legal conclusions drawn from in the Memorandum and Recommendation.

The record reveals that in October 2003, law enforcement agents in Jefferson Parish, Louisiana seized $837,000 of purported proceeds from drug sales.  (Tr. at 11).  A target in that investigation was stopped in a vehicle registered to Mendoza.  (*Id.* at 11, 31, 85, 87).  ICE agents became aware that another targeted suspect had visited a home at 403 West Republic, Baytown, Texas.  Harris County Appraisal District records showed that Mendoza owned that home.   In mid-February 2004, the agents placed Mendoza's home under surveillance.  (*Id.* at 11).  On the morning of February 20, 2004, officers observed a number of vehicles parked at the house, including a gray Volkswagen Passat parked on the street, a black Chevrolet Tahoe, and two Ford pickup trucks in Mendoza's garage.  (*Id.* at 12).  At about 10:00 that morning, agents saw another black Chevrolet Tahoe, bearing a paper license plate, arrive at the house.  (*Id.*).  The officers were unable to observe the driver.  (*Id.*).  Approximately twenty minutes later, two Hispanic males left the house.  (*Id.*).  One of those

men, who was wearing a green shirt, has never been identified.  The other Hispanic male, who wore a white shirt, was later identified as Mendoza.  (*Id.* at 13).  Those two men left in the black Tahoe.  Approximately an hour later, they were seen at an Academy Sporting Goods store close to Interstate 10 in Baytown.  (*Id.* at 13–14).  The two men were followed to an adjacent Home Depot store, where they purchased a roll of black electrical tape.  (*Id.* at 15).  They then drove back to the house on West Republic.  (*Id.*).  About five minutes after they returned, the garage door opened.  The Volkswagen Passat was driven in and the garage door was closed.  (*Id.*).  The Passat stayed behind the closed garage door for several hours.  (*Id.* at 16).

At approximately 4:00 that afternoon, agents saw the Volkswagen being backed out of the garage.  The agents were able to see that it now carried paper license tags.  (*Id.* at 16–17).  Both the Volkswagen and the black Tahoe, with Mendoza driving, left the house and traveled "in tandem" to a parking lot in Baytown, Texas.  (*Id.* at 17, 42).  In the parking lot, Mendoza and the unidentified driver of the Volkswagen met with defendant Foster, who was already there in a tan pickup truck.  (*Id.* at 17).  The agents watched Foster, Mendoza, and the third unidentified male, also Hispanic, talk for approximately ten minutes.  Foster was seen taking luggage from the tan pickup truck and putting it into the Volkswagen Passat.  (*Id.* at 18).  Foster was then given the keys to the Volkswagen, which he drove out of the parking lot, towards Interstate 10, heading east.  (*Id.* at 18–19).

The federal agents then contacted Deputy J.B. Ellis, a Harris County Sheriff's patrol

officer.  The agents described the Volkswagen to Ellis and said that the vehicle had just left a suspected narcotics storage location and might contain "contraband and that, if possible, [he] should develop probable cause and stop the vehicle."  (*Id.* at 93–94).  Deputy Ellis testified that he stopped the Passat at approximately 4:30 p.m., after he observed Foster make an illegal turn.  (*Id.* at 108, 115).  Foster provided consent to search the Volkswagen.  (*Id.* at 97).  Officers discovered a hidden compartment under the rear bumper cover.  (*Id.* at 102).  From that compartment, the agents retrieved twenty-three separate packages each containing approximately one kilogram of cocaine.  (*Id.* at 20).  Most of those packages were wrapped in clear wrap, with an outer cover of black electrical tape on the ends; two of the packages were completely wrapped in black electrical tape.  (Mendoza Ex. 1: Customs Agency Report of Investigation at 4).  Foster was then placed under arrest, handcuffed, and seated in the back of Deputy Ellis's vehicle.  (Tr. 21, 102).  After waiving his right to remain silent, Foster made additional statements about his involvement in cocaine trafficking.  Foster stated that he planned to take the Passat to New Orleans and deliver it to another individual.  Foster also said that Mendoza and two other men were to follow him to New Orleans in the black Chevrolet Tahoe.  (*Id.* at 27).  He explained that, at the outskirts of New Orleans, Mendoza was to give him an address at which to leave the car.  (*Id.*).  Foster stated that Mendoza and the other men would then retrieve the car and deliver the cocaine.  Foster was to return to Houston that evening with the proceeds from the sale of the cocaine.  (*Id.*).

Special Agent Crowe testified that, after Foster's statement, he telephoned the agents

conducting the surveillance at Mendoza's home and told them about the cocaine found in the Volkswagen and that Foster had implicated Mendoza as a participant.  The video recording shows Crowe talking on the telephone.  (*Id.* at 69).  Meanwhile, the agents watching the house on West Republic had observed Mendoza walking back and forth from his garage to a white pickup truck that was parked in his driveway.  (*Id.* at 207–208).  Special Agent Laura Cook testified that Mendoza was carrying items from the garage and placing them in the white pickup, although she could not see what those items were.  (*Id.* at 208).

Following the news of Foster's arrest, federal agents asked a Baytown patrol officer, John Lunsford, to assist.  Officer Lunsford testified that one of the ICE agents told him that Mendoza's house was under surveillance and that the agents were going to "attempt to . . . get a consent to search and they wanted a uniformed Baytown police officer when they did such."  (*Id.* at 134, 140, 143).  Lunsford drove to Mendoza's home to help in the anticipated search.  Several minutes later, Lunsford was told that Mendoza had just left the house.  Lunsford was "asked if [he] could stop the vehicle that had just left the residence."  (*Id.* at 140).  The agents reportedly told Lunsford that they wanted Mendoza detained because an earlier traffic stop had resulted in the seizure of several kilograms of cocaine.  (*Id.* at 135).  With that information, Officer Lunsford drove his patrol car after Mendoza's pickup truck.  (*Id.*).

A video recording taken from the patrol car shows that Lunsford began the pursuit

at about 5:21 p.m. and that he stopped the Mendoza truck at about 5:25 p.m.[1]   (*Id.* at 146–147; Mendoza Ex. 2).  Mendoza's wife, mother-in-law, and six year-old daughter were in the truck with him.  (*Id.* at 142).  The video recording captured Lunsford's request that Mendoza make his hands visible and get out of the truck.  (*Id.* at 147).  Lunsford testified that he had done nothing more than approach Mendoza and ask for his driver's license when a number of federal agents arrived.  (*Id.* at 137; *and see* Mendoza Ex. 2).  Lunsford played no further role.  (Tr. 137).

Special Agent Eric Gann testified that he had followed Officer Lunsford's patrol unit and that he was present when the truck was pulled over, at approximately 6:00 p.m.  (*Id.* at 195).  The videotape shows that three federal agents approached Mendoza's truck, each with his gun drawn, although not pointed at any person.  (Mendoza Ex. 2, *see also* Tr. 198).  Gann explained that, as shown in the video recording, Mendoza was searched for almost a full minute to make certain that he was not armed.  (Mendoza Ex. 2).  Gann stated that he told Mendoza, "you are not under arrest at this point, you are being temporarily detained pending the outcome of this investigation."  (Tr. 196).  Gann testified that he received Mendoza's assurance that he understood that he was not under arrest.  Gann stated that Mendoza not only seemed willing to cooperate with the officers, but seemed rather "relaxed."  (*Id.*).  In response to a question, Gann testified that, at that point, Mendoza was not "free to leave,"

---

[1]         Lunsford testified that he actually made the stop at about 6:00 in the evening, and he could not "explain why the tape time was different" from his own recollection.  (Tr. 136, 155).  He stated further that, at the time of the stop, he had no reason to think that the video camera clock was wrong.  (*Id.* at 159).

because he was "temporarily being detained." (*Id*. at 200).  HPD Officer Joe Garcia testified

that he arrived at approximately 6:01 p.m. or 6:02 p.m., and he saw Mendoza already

standing at the back of his truck, in the midst of the federal agents.  (*Id.* at 163–64).  Garcia

testified that, at that point, had Mendoza chosen not to cooperate, he would not have been

free to leave.  (*Id.* at 191–92).

When the agents were satisfied that Mendoza was not armed, Garcia had him move

away from the back of the pickup truck and to the roadside next to the back of Lunsford's

patrol car.  (*Id.* at 165).  By this time, the Mendoza family was also out of the truck and

standing on the shoulder of the road.  (Mendoza Ex. 2).  Officer Garcia testified that he told

Mendoza that Foster's car had been stopped, that cocaine had been seized from a hidden

compartment in the bumper, and that surveillance officers had seen that car at his house just

before.  (Tr. 165).  After speaking with Mendoza for "approximately four minutes," Garcia

asked him to consent to a search of the house on West Republic.  (*Id.* at 167).  Garcia gave

Mendoza  a written consent to search form and explained it.  Garcia testified that he asked

Mendoza if he could read and understand English, and learned that Mendoza had gone to

school in Roma, Texas.  Garcia testified that "I wanted to make sure that he understood what

he was signing." (*Id.* at 167–168).  Garcia testified that he typically stresses to defendants

that the consent to a search is to be voluntary, and that they have "the right to refuse to sign."

(*Id.* at 182).  Garcia also testified that, based on talking to Mendoza and watching him, he

was "confident" that Garcia understood both the form and the request, as well as his right to

refuse the request.  (*Id*. at 168, 182).  After Mendoza signed, Garcia consulted his watch, and recorded the time, 6:05 p.m., on the form.  (*Id.* at 172).  That notation is consistent with Officer Lunsford's testimony that approximately five minutes elapsed from the time that he stopped the truck to the time that the consent to search was obtained.  (*Id.* at 156).  Special Agent Gann testified that, when Mendoza signed the consent to search form, he was not free to leave.  (*Id.* at 201).

After Mendoza gave his consent to a search of the home, Officer Lunsford drove him there in his patrol car, at the federal agents' request.  (*Id.* at 152–53).  Mendoza was not handcuffed during the ride.  (*Id.* at 138).  Mendoza's family members drove the truck back to the house, followed by one of the agents.  (*Id.* at 152; Mendoza Ex. 1, p. 5).  The video recording shows that Mendoza arrived at the house at about 5:40 p.m., but Special Agent Laura Cook, who was maintaining surveillance, testified that he arrived at approximately 6:35 p.m. (Tr. 205).  During the search of his home, Mendoza remained inside, and was not handcuffed.  (*Id.*).  In response to questioning, Cook agreed that Mendoza was not free to leave the house and that the agents would not have permitted him to leave had he revoked his consent to the search.  (*Id.* at 217–218).  She testified that Mendoza was stopped on the highway so that the agents could obtain his consent to a search.  (*Id.* at 220).

The search of the house uncovered no items of evidentiary value.  (*Id.* at 207).  While the search was in progress, Mendoza was in the house, not handcuffed.  Officer Garcia obtained Mendoza's consent to search the maroon pickup in the garage.  Before that consent

was given, no officer threatened Mendoza or his family or made any promises.  The consent was added to the form Mendoza had already signed.  (*Id.* at 170–71).  Officer Garcia testified that supplied the information on the consent form, but this time he did not note the time at which Mendoza agreed to the search.  (*See* Gov't Ex. 3).

Special Agent Cook testified that more than $475,000 was found in a laundry basket on the front seat of the maroon truck.  (Tr. 207).  The money was all in cash, stacked "in boxes wrapped in stretch wrap."  (*Id.*).  Near the maroon truck, the agents found bags of wrappings, stretch wrap and electrical tape, wrappings similar to the packaging on the cocaine found in Foster's car.  (*Id.* at 208–09).

At some point, Mendoza also consented to a search of the white Ford truck, which was parked in his driveway.  (*Id.* at 170).  For this search, Officer Garcia did complete a second form, recording the time of Mendoza's consent as 6:55 p.m.  (*Id.*; Gov't Ex. 4).  In the white pickup truck, the agents found a vacuum packaging/sealing machine, a receipt, dated the same day, for the purchase of that machine, a scale, two used, and six new rolls of electrical tape, and rolls of stretch wrap.  (Tr. 209).

## II.    The Motion to Suppress

In his motion, Mendoza challenged the admissibility of any incriminating evidence that was seized following the stop of his pickup truck.  He argued that his initial detention violated the Fourth Amendment and that his consent to the searches of his home and trucks was involuntarily given.

### A.      The Investigative Stop

The Magistrate Judge found that the investigative stop was supported by reasonable suspicion and did not violate the Fourth Amendment.  This court adopts the Magistrate Judge's memorandum and recommendation.  The facts in the present record amply support the finding that the investigative stop of the Mendoza vehicle was constitutional.

"[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."  *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680, 83 L. Ed. 2d 604 (1985).  In the course of an investigation, officers have two goals: to investigate and to protect themselves during their investigation.  *See Terry v. Ohio*, 392 U.S. 1, 23, 88 S. Ct. 1868, 1881, 20 L. Ed. 2d 889 (1968) ("[I]n addition [to the governmental interest in investigating crime], there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.").

The officers had significant collective knowledge before stopping Mendoza's truck that supported reasonable suspicion that Mendoza was involved in criminal activity.  In the Louisiana investigation, a suspected drug trafficker used a car registered to Mendoza; a target of the Houston investigation had been seen at Mendoza's house the night before; the gray Passat had been seen at Mendoza's house, and it had been moved out of view, into a closed

garage, for approximately four hours before it left; Mendoza and others were seen meeting with Foster in a parking lot before the cars were exchanged; cocaine was recovered from the Passat; Mendoza had been seen buying electrical tape that day and electrical tape was used to package the drugs found in the Passat; Foster made statements implicating "Lupe"; and Mendoza had been seen transferring unknown objects from the house to the white truck parked in his driveway.  This information provided reasonable suspicion of wrongdoing necessary to support the detention.  Although there was confusion created by inconsistent time recordings in the police vehicles and other information, the record supports the conclusion that before the stop of the Mendoza vehicle, the officers were aware of the stop of Foster's vehicle, the results of the search of that vehicle, and Foster's statements implicating "Lupe."  This court agrees with the Magistrate Judge's recommended finding and conclusion that from the "totality of the circumstances," the collective facts known to the agents before and when Mendoza was intercepted amounted to a "reasonable suspicion" that he was involved in criminal activity, and justified the stop and investigative detention. *Terry*, 392 U.S. at 27.

**B.    The Voluntariness of the Consents to Search**

Six factors bear on the voluntariness of consent: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the

defendant's belief that no incriminating evidence will be found. Although all six factors are relevant, no single factor is dispositive. *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993) (internal quotation and citation omitted); *United States v. Portillo-Aguirre*, 311 F.3d 647, 658–59 (5th Cir. 2002).

The Magistrate Judge found that the consents to search were not voluntarily provided, recognizing that the question was a close one. A careful review of the record leads this court to reject this recommended finding and conclusion, and instead to hold that the consents were voluntarily given.

The consent to search the house was the first Mendoza provided. As to the first factor, the evidence is undisputed that although he was not under arrest, he was subject to detention and was not free to leave. The courts have recognized three types of encounters between law enforcement officers and citizens, including: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable cause; and 3) an arrest which constitutes a seizure under the Fourth Amendment. *United States v. Cooper*, 43 F.3d 140, 145–46 (5th Cir. 1995). This encounter fell into the second category. Although Mendoza was detained for investigative purposes and not free to leave, the evidence is undisputed that he was not under arrest, not in custody, and not physically restrained. He was not handcuffed before he gave the consent. Although he was fully patted down as soon as he got out of the truck, he was not otherwise physically touched or restrained until after he gave the consents.

The second factor—the procedures the police used—was significant to the Magistrate Judge's conclusion that Mendoza's consent to search was not voluntary.  The most significant evidence was that when officers approached Mendoza's vehicle, some had their weapons drawn.  The evidence showed that the officers had their weapons drawn but not pointed at any person when they approached the truck.  Such an approach is consistent with the officers' collective knowledge that the driver of the truck was suspected of involvement in distributing a large amount of cocaine.  It does not appear that the officers who talked to Mendoza to obtain his consent to search displayed their weapons in any way.  The officers testified that they talked to Mendoza in normal conversational tones, without physical or verbal threat or any promise.  The officers testified that Mendoza was calm and appeared "relaxed."  Both the undisputed testimony, the evidence from the videotape, and the case law make it clear that a brief display of weapons by officers in effecting a *Terry* stop does not amount to coercion that precludes voluntary consent.  *See United States v. Broussard*, 80 F.3d 1025, 1036 (5th Cir. 1996); *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (citing cases and noting "[t]he vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se"); *United States v. Yeagin*, 927 F.2d 798, 801 (5th Cir. 1981); *see also United States v. Trueber*, 238 F.3d 79, 94 (1st Cir. 2001); *United States v. Kimball*, 741 F.2d 471, 474 (1st Cir. 1984); *c.f. United States v. Morales*, 171 F.3d 978, 983 (5th Cir. 1999) (finding consent involuntary when officers rushed into warehouse with guns drawn

and ordered suspects to the floor).  The absence of handcuffs or other physical restraint further supports an absence of coercive procedures.  At the house, Mendoza agreed to a search of two vehicles, with no evidence of any coercive procedures other than what is inherent in the presence of police and an inability to leave.  The cases are clear that the presence of officers during detention is not sufficiently coercive to preclude voluntary consent.  *See United States v. Solis*, 299 F.3d 420, 438 (5th Cir. 2002); *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997); *United States v. Jones*, 475 F.2d 723, 729 (5th Cir. 1973).

The third factor, the extent and level of the defendant's cooperation with the police, supports a finding of voluntariness.  The evidence was undisputed that Mendoza fully cooperated with the officers as they explained the consent form to him, accompanied them to the house, and agreed to the search of two vehicles.  Mendoza also answered all questions posed by the officers.  Nowhere in the record is it reflected that Mendoza was uncooperative with the officers at any time.

The fourth factor, the awareness of the right to refuse consent, similarly supports a finding of voluntary consent.  The evidence was undisputed that Mendoza was told that he had a right to refuse before he signed the consent to search the house.  The evidence was undisputed that this was repeated before Mendoza consented to the searches of the two vehicles.  Although there is no evidence of prior criminal history, the cases do not require that direct experience in police procedures is necessary for voluntary consent.

The fifth factor, the defendant's education and intelligence, do not weigh against a finding of consent.  The evidence showed that Mendoza had gone to school in Roma, Texas, and could speak and understand English.  There is no evidence of any deficiency in either education or intelligence that would make his consent to search involuntary.

The fifth factor is whether the defendant believed that officers would find incriminating evidence.  The evidence shows that Mendoza did not believe that officers would find any incriminating evidence in his house, but presumably was aware that there was a large amount of money inside one truck.  This factor weighs in favor of finding voluntary consent as to the house, but is not determinative in the analysis.  *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002).

The totality of the circumstances supports a finding of voluntary consent to search. Mendoza gave written consent to search the residence and two vehicles, signing two separate consent forms.  Both consent forms informed Mendoza of his right to refuse consent.  He was cooperative and gave every indication of understanding what the police said.  He was not under arrest, although he was not free to leave.  There were no coercive police procedures used to obtain the consents.  *See, e.g., Solis*, 299 F.3d at 439.  Accordingly, based on an application of the facts shown in the record to the six-factor inquiry, this court concludes that Mendoza's consent to search his home and the two vehicles was voluntarily given.

**III.     Conclusion**

The Magistrate Judge's Memorandum and Recommendation is adopted in part. Mendoza's motion to suppress is denied.

SIGNED on May 12, 2005, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge